*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *ESTATE OF DANIEL BENNETT, II,* | ) | |
| *et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Docket No. 06-28-P-S* |
| | ) | |
| *CHRISTOPHER WAINWRIGHT, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*MEMORANDUM DECISION ON MOTION TO EXCLUDE EXPERT WITNESS AND*
*RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT*

The plaintiffs in this removed action arising under 42 U.S.C. § 1983 move to exclude the defendants' expert witness, David Dusenbury. Defendants Christopher Wainwright, Matthew Baker, James Miclon, James Davis, Lloyd Herrick and Oxford County ("Oxford County defendants") seek judgment on the pleadings or summary judgment on all claims asserted against them. Defendant Timothy Turner moves to dismiss, or, in the alternative, for summary judgment. I deny the motion to exclude and recommend that the court grant Turner's motion to dismiss, grant the motion for judgment on the pleadings in part and grant the defendants' motions for summary judgment on those claims that I do not recommend be dismissed or as to which I do not recommend judgment on the pleadings.

**I. Motion to Exclude**

The plaintiffs contend that any testimony to be offered by the plaintiffs through their designated expert witness, David Dusenbury, should be excluded as a sanction for the defendants' failure to provide the plaintiffs with a signed report from Dusenbury in accordance with Fed. R. Civ. P.

26(a)(2)(B).  Plaintiffs' Motion to Exclude Defendants' Expert Witness, etc. ("Motion to Exclude")

(Docket No. 57) at 1-2.  That rule provides, in relevant part:

### (2) Disclosure of Expert Testimony

> **(A)**   [A] party shall disclose to other parties the identity of any person
> who may be used at trial to present evidence under Rules 702, 703, or 705 of
> the Federal Rules of Evidence.

> **(B)**   Except as otherwise stipulated or directed by the court, this
> disclosure shall, with respect to a witness who is retained or specially
> employed to provide expert testimony in the case . . . be accompanied by a
> written report prepared and signed by the witness.  The report shall contain a
> complete statement of all opinions to be expressed and the basis and reasons
> therefor; the date or other information considered by the witness in forming
> the opinions; any exhibits to be used as a summary of or support for the
> opinions; the qualifications of the witness, including a list of all publications
> authored by the witness within the preceding ten years; the compensation to
> be paid for the study and testimony; and a listing of any other cases in which
> the witness has testified as an expert at trial or by deposition within the
> preceding four years.

Fed. R. Civ. P. 16(a)(2)(A)-(B).

This court's standard scheduling order, like the scheduling orders in this case, specifically

directs, with respect to the disclosure of an expert witness's "opinions to be expressed," as follows:

> If the expert is retained or specially employed to provide expert testimony
> in the case . . . the disclosure shall also include the other categories of
> information specified in Fed. R. Civ. P. 26(a)(2)(B).   All required
> information may, but need not, be provided in the form of a written report
> prepared and signed by the expert.

Scheduling Order, etc. (Docket No. 10) at 2; Report of Conference of Counsel and Revised Scheduling

Order (Docket No. 27) at 2.  Accordingly, the fact that a report written and signed by Dusenbury was

not provided to the plaintiffs in this case provides no basis for sanctions by this court, let alone the

draconian sanction sought by the plaintiffs.

The plaintiffs also apparently contend that the disclosures concerning Dusenbury provided by

the plaintiffs were inadequate.  Memorandum of Law in Support of Plaintiffs' Motion to Exclude, etc.

(attached to Motion to Exclude) at [2].[1]  They assert, in conclusory fashion, that "[t]he one-page, unsigned statement of the summary of the expert's anticipated opinions did not satisfy their obligation to provide an expert report signed by the expert detailing the opinions. . . . [T]he statement consists of conclusory paragraphs and is designedly incomplete[.]"  *Id*.

　　　　To the extent that this argument may reasonably be construed as an attack on the sufficiency of the defendants' designation of Dusenbury that is distinct from the argument that a signed report from Dusenbury was required, it also fails.  The designation, a four-page document a copy of which is Attachment A to the Motion to Exclude, includes two full pages of single-spaced type concerning the opinions to be expressed by Dusenbury and the bases and reasons for those opinions.  The designation is sufficient under the terms of the scheduling order.  If, as the plaintiffs fear, Dusenbury "attempt[s] . . . to supplement [his] opinions at a later date by the mechanism of stating that [he] had other opinions but you did not ask [at deposition]," Memorandum at [2], that matter may be dealt with at the time it occurs.  I note that Fed. R. Civ. P. 26(e) provides for supplementation of expert witness disclosures.  If the defendants attempt to offer at trial opinion testimony from Dusenbury that is not within the scope of the initial disclosure or any supplements properly made within the terms of Rule 26, the plaintiffs may object at that time and the trial judge will exclude such testimony as appropriate.  At this time, the plaintiffs have not offered any reason to exclude Dusenbury's testimony in its entirety or even in any particular respect.

　　　　The motion to exclude is denied.

---

[1] Counsel for the plaintiffs is reminded that this court's Local Rule 7(e) requires the pages of all memoranda of law to be numbered at the bottom.

## II.  Motion to Dismiss

### A. Applicable Legal Standard

Defendant Turner does not identify the basis for his motion to dismiss or even which of the arguments in his memorandum of law is directed toward his motion to dismiss and which are to be considered in connection with his motion for summary judgment.  I will address those arguments traditionally made in connection with a motion to dismiss under the rubric of Fed. R. Civ. P. 12(b)(6), which, as best I can determine, is most likely to provide the basis for Turner's motion.  The plaintiffs assume that this is the rule invoked.  Plaintiffs' Objection, etc. (Docket No. 113) at [2].  "[I]n ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff[]."  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).  The defendants are entitled to dismissal for failure to state a claim only if "it appears to a certainty that the plaintiff would be unable to recover under any set of facts."  *State St. Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001); *see also Wall v. Dion*, 257 F. Supp.2d 316, 318 (D. Me. 2003).

Although the words "Motion to Dismiss" appear in the title and the word "dismissal" appears in the heading of two subsections of their response, Plaintiff's [sic] Consolidated Memorandum of Law in Opposition to Defendant's [sic] Motions for Summary Judgment, Judgment on the Pleadings and Motion to Dismiss ("Plaintiffs' Opposition") (attached to Docket No. 113) at 1, 39, 40, the plaintiffs appear to respond only to the motions for summary judgment, *id.* at 3-5, 31, 39-44.

### B.  Factual Background

The complaint, read indulgently as required with respect to a motion to dismiss, includes claims that Turner, a Maine state trooper, "forc[ed the plaintiffs] out of the house [in which plaintiff Arlene Bedard and her son, Daniel W. Bennett, II, lived] without authority," Complaint (Attachment 3

to Notice of Removal (Docket No. 1)) ¶¶ 2(a), 3(c), 13, 23; "violated plaintiffs' rights to be free from improper search and seizure without a warrant," *id*. ¶ 23a; trespassed, *id*. ¶ 23b; "violated the plaintiff's [sic] right to due process," *id*. ¶ 23[2];[2] conspired with the other defendants "to violate the Fourth and Fourteenth Amendments to the Constitution, to trespass on the plaintiffs' property, to cover up wrong doing, to intentionally create a dangerous condition which in fact caused harm, to take property without compensation or without due process," *id*. ¶ 27[i]; shot and killed Daniel W. Bennett, II, "whether acting individually or in concert," *id*. ¶ 45; did not permit adequate medical care to be provided to Daniel W. Bennett, II, *id*. ¶ 40; engaged in "illegal quartering," *id*. ¶ 46; caused the plaintiffs "to suffer extreme emotional distress," *id*. ¶ 46b; harassed the plaintiffs "by calling from the Oxford County Sheriff's Office repeatedly and without cause to plaintiff's home at early morning times and then not engaging in conversation but repeatedly and continuously remaining silent to intimidate," *id*. ¶ 46c[2]; and violated the Maine Civil Rights Act, *id*. ¶¶ 48-50.

## C.  Discussion

Turner sees attempts to allege claims under Maine's wrongful death statute, 18-A M.R.S.A. § 2-804, and the Maine Tort Claims Act, 14 M.R.S.A. § 8101 *et seq*., in certain factual allegations in the plaintiffs' complaint and then presents reasons why the complaint fails to state claims under these statutes.  Defendant Turner's Motion to Dismiss and for Summary Judgment ("Turner Motion") (Docket No. 55) at 5-6.  However, the complaint itself purports to assert state-law claims only under the Maine Civil Rights Act, Complaint ¶¶ 6, 49-50, Maine's counterpart to 42 U.S.C. § 1983, and this court will not read the complaint to invoke other, unspecified Maine statutes.  The only other portions of Turner's motion that may reasonably be construed to present arguments for dismissal rather than for summary judgment contend that the plaintiffs seek certain damages that are not available under either

---

[2] The complaint contains two paragraphs numbered 23, two each numbered 23a-b, two numbered 45, two numbered 46, two (*continued on next page*)

section 1983 or the Maine Civil Rights Act, Turner Motion at 5, that an allegation of a conspiracy to cover up wrongdoing does not state a claim, *id*. at 7, that plaintiff Hart lacks standing to assert any of the claims she brings,[3] *id*. at 7-8, 10; and that the complaint fails to state a claim for denial of substantive due process, *id*. at 18-19.

With one exception, the plaintiffs' failure to respond[4] to any of these arguments means that the motion to dismiss on these specific grounds may be granted for that reason alone. *Andrews v. American Red Cross Blood Servs*., 251 F.Supp.2d 976, 979 (D. Me. 2003). No reason to the contrary having been suggested by the plaintiffs, the following claims against Turner should be dismissed: claims of Arlene Bedard, Isabel Bedard and Laurie Hart for damages arising from extreme emotional distress, loss of care, comfort and companionship, and severe emotional shock, pain and suffering (Complaint ¶¶ 46b, 46c, 47 & 47[2]); any claim of a conspiracy to cover up wrongdoing (Complaint ¶ 27i); and claims asserted by Laurie Hart.

The exception is the claim for denial of substantive due process, which the plaintiffs do address in a manner which might be construed to encompass the motion to dismiss. Plaintiffs' Opposition at 24-31. Turner contends that "[t]his is an excessive force case and the actions of Turner are to be analyzed under the Fourth Amendment's 'objective reasonableness' rubric rather than a substantive due process, 'shocks the conscience' standard." Turner Motion at 18. The plaintiffs do not respond directly to this argument, asserting only that they have alleged the elements of a substantive due process claim. Plaintiffs' Opposition at 25-30. Turner's position is correct when the

___

numbered 46c and two numbered 47. I have designated the second incarnation in each case with the number 2 in brackets.

[3] The plaintiffs appear to concede this point, at least in part, when they assert in their opposition that only "[p]laintiffs Arlene Bedard and Isabelle [sic] Bedard and the Estate have pressed a claim for search and seizure for being forced out of their home." Plaintiffs' Opposition at 9.

[4] Even if the mention of dismissal in three headings in the plaintiffs' 44-page memorandum of law could reasonably be deemed a response to the motion to dismiss, issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F.Supp.2d 131, 152-53 (D. Me. 2006).

complaint at issue presents "a straightforward Fourth Amendment excessive force claim." *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51 (1st Cir. 2005), but that is not the only possible interpretation of the allegations in the complaint at issue here.  The complaint alleges a state-created danger that led to harm to the plaintiffs; such a claim may implicate substantive due process.  *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 80-81 (1st Cir. 2005).  The problem for the plaintiffs, however, is that such a claim also requires that the harm alleged have been caused by a third party, *id.* at 81, and here the complaint alleges that the harm was caused by the state-actor defendants themselves.  Accordingly, Turner is entitled to dismissal of any substantive due process claims asserted against him.

### III.  Motion for Judgment on the Pleadings

### A. Applicable Legal Standard

The Oxford County defendants move for judgment on the pleadings on the plaintiffs' claims for due process violations, equal protection violations, illegal quartering, taking without just compensation and state-law violations.  Amended Motion of Defendants Christopher Wainwright, Matthew Baker, etc. ("County Motion") (Docket No. 67) at 7.  This motion invokes Fed. R. Civ. P. 12(c).  *Id.* at 6.  A motion under Rule 12(c) generally is treated in the same manner as a Rule 12(b)(6) motion to dismiss.  *Mank v. Green*, 350 F.Supp.2d 154, 157 (D. Me. 2004).  In reviewing a motion under Rule 12(c), the court must accept as true all of the nonmoving party's well-pleaded factual averments and draw all reasonable inferences in its favor.  *Feliciano v. Rhode Island*, 160 F.3d 780, 788 (1st Cir. 1998).  Judgment on the pleadings may be entered if the non-moving party can prove no set of facts in support of its claim that would entitle it to relief.  *Id.*

## B. Factual Background

The complaint alleges that Wainwright forced the plaintiffs out of the house where Arlene Bedard and Dan Bennett resided "without authority," Complaint ¶ 23; requisitioned the house "with out [sic] a legal document and with [sic] compensation," *id*.; trespassed, *id*. ¶ 23b; "escalate[d] the encounter with Daniel Bennett, creating a danger where none had existed or increasing the danger if any did exist," *id*. ¶ 23[2], and shot and killed "the plaintiff," *id*. ¶ 45[2]. It alleges that Miclon, Davis, Herrick and the county failed to train or educate Wainwright properly, thereby violating "the plaintiff's right to due process," and subjecting "a member of the recognized class of mentally ill" to disparate treatment, depriving Daniel Bennett of equal protection and due process, *id*. ¶¶ 23[2], 23e; and provided dangerous instrumentalities to Wainwright and Baker, while knowing of "his" propensity to escalate force, *id*. ¶¶ 23b[2]-23c. It alleges that Baker failed to control Wainwright and "further escalated the confrontation," *id*. ¶ 27, and shot and killed "the plaintiff," *id*. ¶ 45[2]. It alleges that the county defendants "had a special relationship with the plaintiffs . . . which required a duty of care and a proscribed [sic] course of conduct," *id*. ¶ 24a; unlawfully seized "the plaintiffs' household," searched their property and trespassed, *id*. ¶ 27g; conspired to violate the plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution, to cover up wrongdoing and to take property without compensation and due process, *id*. ¶ 27i; did not permit adequate medical care to be provided to Daniel Bennett, *id*. ¶ 40; and harassed the plaintiffs "through the use of Oxford County instrumentalities to terrorize plaintiffs by calling from the Oxford County Sheriff's Office repeatedly and without cause to plaintiff's [sic] home at early morning times and then not engaging in conversation but repeatedly and continuously remaining silent to intimidate," *id*. ¶ 46c[2].

Again, the plaintiffs do not respond directly to the motion for judgment on the pleadings, referring to it only in the title of their response. Plaintiffs' Opposition at 1.

8

## C.  Discussion

The county defendants first argue that any substantive due process claims in this case are foreclosed by the holding in *Graham v. Connor*, 490 U.S. 386, 395 (1989), to the effect that all claims of use of excessive force by law enforcement officers may be analyzed only under the Fourth Amendment.  County Motion at 7.  For the reasons discussed above, I conclude that the complaint alleges federal constitutional violations other than the use of excessive force but that the claim identified by the plaintiffs in this regard — a state-created danger, Plaintiffs' Opposition at 24-30 — requires that a third person cause the harm alleged, not the state actors who are alleged to have created the danger or to have a special relationship with the plaintiffs.  The complaint makes no such allegations.  Accordingly, the motion should be granted as to any substantive due process claims.

The county defendants next contend that no procedural due process claim may be pressed against them under the circumstances of this case because an adequate state remedy exists.  County Motion at 7-8.  They identify this remedy as a claim for the intentional infliction of emotional distress, *id*., although that is not alleged as a separate claim in the complaint.  The plaintiffs do not respond to this argument at all, and the motion for judgment on the pleadings may therefore be granted as to any procedural due process claims.  *NEPSK, Inc. v. Town of Houlton*, 283 F.3d 1, 5-6 (1st Cir. 2002).

The third claim addressed by the county defendants is that for violation of the equal protection rights of the decedent.  County Motion at 8.  They assert that "nowhere does Plaintiffs' Complaint allege, either expressly or implicitly, that Bennett was treated differently from others who were similarly situated, that there was no rational basis for any disparate treatment, or that the motivation for such disparate treatment was malice or bad faith intent to injure." *Id*.[5]  The plaintiffs respond that

---

[5] The county defendants' earlier assertion that a plaintiff must plead that the disparate treatment was based on malicious or bad faith intent to injure as well as the lack of a rational basis for the disparate treatment, County Motion at 8, is incorrect.  *See Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004) (setting out the two elements in the alternative).

"Dan was a member of a class of mentally ill persons and was a member of the AMHI class for consent decree purposes." Plaintiffs' Opposition at 31. The complaint cannot be reasonably construed to allege the latter factual assertion. It does allege that Miclon, Davis, Herrick and the county exhibited intentional or reckless indifference to the rights of "Plaintiff's" resulting in "disparate treatment . . . to [sic] a member of the recognized class of mentally ill" and failed "to treat the plaintiff Daniel [sic] equally to the rest of the citizens of Oxford County" thus depriving Bennett of "the equal protection of the laws." Complaint ¶ 23e. This is the only specific allegation in the complaint concerning equal protection. *See id*. ¶ 45[2]. The complaint also alleges that the actions of Wainwright and Baker (but not Miclon, Davis, Herrick or the county) "were conducted with malice . . . and were taken in bad faith," *id*. ¶ 38, but that allegation cannot be read to allege an equal protection violation against those two defendants, and they are entitled to judgment at to any equal protection claims against them.

The complaint does not expressly allege that "the rest of the citizens of Oxford County" were situated similarly to Daniel Bennett for purposes of the equal protection claim, but that allegation may reasonably be inferred. The allegation of a lack of a rational basis for the alleged intentional or reckless conduct may also be inferred. The defendants do not argue that "the rest of the citizens of Oxford County" are not or cannot be similarly situated to Daniel Bennett for purposes of this claim or that Bennett could not be a member of a suspect classification. Inasmuch as the plaintiffs' opposition must be read extremely indulgently in order to conclude that it responds to the defendants' argument on this point, I believe that it may be so read. Miclon, Davis, Herrick and the county are not entitled to judgment on the pleadings on the equal protection claim.

The county defendants next attack the complaint's "quartering" claim. County Motion at 8-9. The plaintiffs' opposition confirms that this is a claim under the Third Amendment. Plaintiffs'

Opposition at 41-42.  The allegations in the complaint concerning this claim are less than illuminating. Complaint at 3 ("plaintiffs allege they were subject to forced quartering") & ¶¶ 23f ("[t]he pattern and practice of the use of arrest as a coercive technique in the mental []health setting . . . was the driving force of the constitutional deprivations of . . . quartering") & 46[2] ("plaintiff has been damaged by the violation of their [sic] right against . . . illegal quartering").  The Third Amendment provides, in its entirety: "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."  U.S. Const. Amend. III.  The plaintiffs' position appears to be another of the "far-fetched, metaphorical applications" of this amendment that have been "summarily rejected" as noted by the Second Circuit.  *Engblom v. Carey*, 677 F.2d 957, 959 n.1 (2d Cir. 1982).  There is no sense in which a single state trooper and several deputy sheriffs can be considered "soldiers" within the meaning of that word as it is used in the amendment nor in which the use of a house presumably owned by one of the plaintiffs for a period of fewer than 24 hours could be construed as "quartering" within the scope of the amendment.  The county defendants are entitled to judgment on the pleadings as to any claim asserted under the Third Amendment.

Moving on, the county defendants contend that the complaint does not allege a taking of private property without just compensation under the Fifth Amendment because it alleges only a temporary, partial deprivation, not a deprivation of all economic use.  County Motion at 9-10.  The plaintiffs' response on this issue is sketchy at best, stating in conclusory fashion that they "have alleged a Fifth Amendment taking without just compensation in complaint at ¶ 45 [sic]."  Plaintiffs' Opposition at 42. I disagree.  That paragraph of the complaint does not allege a taking without compensation under the Fifth Amendment at all; its only mention of the Fifth Amendment is in connection with the decedent's right to due process of law.  Complaint ¶ 45[2].  The mention of a taking without compensation is

found in paragraph 46e of the complaint: "[T]he taking of the property of the plaintiffs Bennett and Bedard was . . . without just compensation for the substantial diminution in the value of the property taken[.]"  Even here, however, the complaint fails to state a claim on which relief may be granted. The county defendants' position misstates the applicable standard.  When there is a physical taking of possession of private property, the courts "do not ask . . . whether it deprives the owner of all economically valuable use," nor does it necessarily matter that the taking was temporary.  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-24 (2002). But when the appropriate standard is applied, the defendants are entitled to judgment on the pleadings.[6]  A necessary element of a physical takings claim is that compensation for the alleged taking must have been sought from the relevant state actor or agency if available, or the plaintiff must show that the compensation sought is otherwise unavailable.  *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 91-92 (1st Cir. 2003).  The complaint in this case alleges neither.  For all that appears, this court is accordingly unable to entertain this claim.  *Id*. at 94 & n.7 (affirming dismissal). This court may consider this ground for entry of judgment on the pleadings *sua sponte* because it affects this court's subject-matter jurisdiction.  *See Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006).  All of the defendants, including Turner, are entitled to judgment on the pleadings on any takings claim.

Finally, the county defendants argue that the plaintiffs' state-law claims are barred by the statute of limitations applicable to their tort claims.  County Motion at 10.  As I noted in my discussion of Turner's motion to dismiss, I construe the complaint to allege state-law claims only under the Maine Human Rights Act, despite its demand for certain forms of relief usually available on specific tort or other statutory claims.  No claim is made that the statute of limitations applicable to the Maine Human

_____

[6] Because there are no entries in the plaintiffs' 158-page statement of material facts on the issue of the availability of compensation, the (*continued on next page*)

Rights Act ran before the complaint was filed. The county defendants are not entitled to judgment on the pleadings on Count II, the state-law claim.

## IV.  The Motions for Summary Judgment

### A.  Applicable Legal Standard

*1.  Federal Rule of Civil Procedure 56.*  Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the

same result would obtain were I to consider this issue in the context of the defendants' motions for summary judgment.

moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

2. *Local Rule 56.*  The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently

upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at

their peril and that failure to present a statement of disputed facts, embroidered with specific citations

to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed

facts admitted." (Citations and internal punctuation omitted).

## B. Factual Background

The following undisputed material facts are properly presented and supported in the parties'

respective statements of material facts.

Plaintiff Arlene Bedard is the mother of Daniel Bennett, II, and the personal representative of

his estate.  Defendants' Statement of Material Facts in Support of Motion For Summary Judgment

("Defendants' SMF") (Docket No. 58) ¶ 1; Plaintiffs' Response to Defendants' Statement of Material

Facts, etc. ("Plaintiffs' Responsive SMF") (Docket No. 114) ¶ 1.  Plaintiff Isabel Bedard is the

mother of Arlene Bedard and the grandmother of Daniel Bennett, II.  *Id*. ¶ 2.  Plaintiff Laurie Hart is

the sister of Daniel Bennett, II, the daughter of Arlene Bedard and the granddaughter of Isabel Bedard.

 *Id*. ¶ 3.  At the time of the relevant events, Daniel Bennett, II, Arlene Bedard and Isabel Bedard

resided at 250 Upper Sumner Hill Road in Sumner, Maine.  *Id*. ¶ 4.  The residence was then owned by

Isabel Bedard.  *Id*.

At the time of the events at issue, Laurie Hart resided at 1147 Main Street in Sumner, Maine,

did not have any ownership interest in the 250 Upper Sumner Hill Road property and owned no

personalty inside the house at that address that was damaged during the incident that gives rise to this

action.  *Id*. ¶¶ 5-6.  At no time on the day of the incident was she even in the house at 250 Upper

Sumner Hill Road.  *Id*. ¶ 6.

Defendant Timothy Turner is a Maine State Police trooper and has been a trooper since

August, 1986.  *Id*. ¶ 7.  Throughout his career with the Maine State Police, he has received training

15

that included a course in dealing with the mentally ill and being a first responder in crisis situations. *Id*. ¶ 8.  He has also received in-service training in the use of force, the Americans with Disabilities Act, civil rights, cultural diversity, defensive tactics, domestic violence, ethical decision-making, use of non-deadly force, dealing with people with mental health issues, policing culturally diverse communities and use of firearms.  *Id*.  Prior to January 21, 2000 Turner had never fired his weapon on active duty other than for training purposes.  *Id*. ¶ 9.

Defendant Christopher Wainwright has been a deputy sheriff with the Oxford County Sheriff's Department since 1990.  *Id*. ¶ 10.  He was a corporal at the time of the relevant events.  *Id*.  His training included the 100-hour basic municipal police school conducted by the Maine Criminal Justice Academy and courses involving dealing with the mentally ill, interview and interrogation techniques, deviant behavior and the Oxford County Sheriff's Office policy for deviant behavior, first responder to hostage negotiations, self defense, CPR/first aid, OC spray, civil rights and liability and field tactical police operations.  *Id*. ¶ 11.[7]  He has extensive firearms qualifications, including the FBI advanced firearms instructor course.  *Id*. ¶ 12.  He is the Oxford County Sheriff's Department's firearms instructor.  *Id*.  He has been involved in one other situation in which he shot and killed a subject in the line of duty.  *Id*. ¶ 14.  He responded to the Bennett residence on one occasion for a situation in which Daniel Bennett was in some sort of mental distress.  *Id*. ¶ 18.  He was not directly involved with Bennett on that occasion and does not recall the date of the incident.  *Id*.

Defendant Matthew Baker has been a deputy sheriff with the Oxford County Sheriff's Department since approximately 1990.  *Id*. ¶ 19.  He was a patrol deputy at the time of the events at

---

[7] The plaintiffs purport to deny paragraph 11 of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 11, but the paragraphs of their own statement of material facts which are cited, without any specific response to the defendants' factual assertions, do not address any of the factual assertions made in paragraph 11 of the defendants' statement of material facts, *see* Plaintiffs['] Additional Statement of Material Facts ("Plaintiffs' SMF") (included in Plaintiffs' Responsive SMF beginning at 52) ¶¶ 953-62, which are accordingly deemed admitted because they are supported by the summary judgment material cited by the defendants.

16

issue in this case.  *Id*.  He attended the 100-hour basic municipal police school at the Maine Criminal

Justice Academy.  *Id*. ¶ 20.  He has received additional training in firearms use, self defense, Oxford

County policies and procedures, deviant behavior, high-risk communications, first responder to

hostage negotiations, civil rights and liability, critical incidents and operational planning.  *Id*. ¶ 21.[8]

He has never been involved in any incidents where he fired his weapon in the line of duty other than

this case.  *Id*. ¶ 22.  He had no prior experience with Bennett or his family.  *Id*. ¶ 23.

Defendant James Miclon has been employed by the Oxford County Sheriff's Department since

approximately July 1980.  *Id*. ¶ 26.  He was a captain at the time of the events at issue.  *Id*.  He

completed the Maine Criminal Justice Academy municipal/county basic police school in 1982.  *Id*.

¶ 27.  In addition, he has received training in civil rights, liability management, policies and

procedures, civil liability and critical incident/stress management.  *Id*.  He has never fired a weapon

in the line of duty.  *Id*. ¶ 29.

Defendant James Davis has been employed by the Oxford County Sheriff's Office since 1991.

*Id*. ¶ 31.  He was chief deputy of the department at the time of the events at issue in this case.  *Id*.  He

has been accredited as a law enforcement officer by the Maine Criminal Justice Academy.  *Id*. ¶ 32.

He has also received training courses in due process, firearms qualification, minimum policy and

procedure standards, police liability, deviant behavior, critical incident management and domestic

violence.  *Id*. ¶ 33.  He has attended numerous departmental training sessions involving policy and

procedure review.  *Id*.  He has received training in and is familiar with the Oxford County Sheriff's

Department policies and procedures 2-1 (use of force), 2[-]3 (firearms), 2-15 (barricaded subjects)

---

[8] As they do in many instances, the plaintiffs purport to qualify this paragraph in their responsive statement of material facts, Plaintiffs' Responsive SMF ¶ 21, but the paragraphs of their own statement of material facts that are cited as the sole information following the word "qualified" do not address any of the facts asserted in paragraph 21 of the defendants' statement of material facts, Plaintiffs' SMF ¶¶ 450-51, which accordingly are deemed admitted because they are supported by the citations given by the defendants to the summary judgment record.  In order to avoid cluttering this opinion with dozens of similar footnotes, I will specifically mention a (*continued on next page*)

and 2-16 (protective custody).[9] *Id.* ¶ 34.  He had no prior experience with Bennett nor had he been to Bennett's residence before the events at issue.  *Id*. ¶ 35.

Defendant Lloyd Herrick has been sheriff of Oxford County since January 1991.  *Id*. ¶ 36.  He has completed the municipal/county basic police school through the Maine Criminal Justice Academy.  *Id*. ¶ 37.  He has received additional training in hostage negotiation, civil and vicarious liability, tactical team concept training, civil liability, police liability, law enforcement liability, minimum standards for policies and procedures and firearms.  *Id*. ¶ 38.  He has received training in and is familiar with the Oxford County Sheriff's Department policies and procedures 2-1, 2[-]3, 2-15 and 2-16.  *Id*. ¶ 39.  He has never been involved in a police-related shooting.  *Id*. ¶ 40.  He was not at the scene of the incident in this case and has never had any experience with Bennett.  *Id*. ¶¶ 42-43.

Between 1996 and 2000 Bennett had various psychological problems for which he was prescribed medication.  *Id*. ¶¶ 44-45.  In November 1999 he stopped taking his medication.  *Id*. ¶ 45.  Before January 2000 law enforcement had been summoned to the Bennett residence because of his psychological problems, and Turner had been there twice as back-up to an Oxford County deputy sheriff.  *Id*. ¶ 46.  During those incidents, Turner and the deputies had no difficulty in handling the situation with Bennett.  *Id*. ¶ 48.

On the morning of January 21, 2000 Bennett had walked ten to fifteen miles through the snow in low shoes or slippers from Buckfield to his home.  *Id*. ¶ 49.  The only person present when he arrived was Isabel Bedard, who was concerned about his behavior because, among other things, he had gone outside and beaten a dog with an object.  *Id*. ¶¶ 49-50.  In a statement given to the attorney general on

___

"qualified" response from the plaintiffs only when that qualification does address all or some portion of the paragraph of the defendants' statement of material facts that is at issue.

[9] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, but the denial does not address the factual statements made in the paragraph, Plaintiffs' Responsive SMF ¶ 34, which are supported by the record citations given by the defendants and accordingly are deemed admitted.

January 21, 2000 Isabel stated, "I went and looked, and he had a baseball bat and he was beating a dog." *Id*. ¶ 51.  Isabel tried to contact her daughter, Arlene, at work.  *Id*. ¶ 52.  When she could not, she called her granddaughter, Laurie Hart.  *Id*.  Isabel was crying and scared during this conversation.  *Id*. ¶ 53.  Hart called Arlene at work.  *Id*.  ¶ 54.  Although Hart  was unable to go to the Bennett house herself, Arlene told her that she would head over there.  *Id*.  Because of her concerns for her grandmother, Hart also called her cousin, Derek Laughton, and asked him to go to the Bennett house. *Id*. ¶ 56.  She was sufficiently concerned that she called Laughton approximately five minutes later and implored him to go to the house immediately.  *Id*.

Hart next called her husband, Timothy Heap, at work, telling his employer that there was a real emergency.  *Id*. ¶ 57.  Heap went to the Bennett house.  *Id*.  When Arlene arrived home, she encountered Isabel, Derek Laughton and Danny Laughton. *Id*. ¶ 58.  When Arlene tried to speak with Bennett, Bennett said, "Leave me the fuck alone, I don't want to kill you, too." *Id*. ¶ 60.

Arlene called 911, which connected her with the Oxford County Sheriff's Office.  *Id*. ¶ 63. She told the dispatcher that Bennett "just told me to get out of there he's going to kill me, so I came out here to call you."  *Id*.  She also informed dispatch that Bennett had killed a dog with a bat, that he was not taking his prescribed medication and that "we need somebody right away."  *Id*.

At approximately 2:00 p.m. Wainwright was contacted by dispatch; he was told that a male at the Bennett residence had beaten a dog to death with a baseball bat and had threatened family members.  *Id*. ¶ 64.  Wainwright was in Mexico, Maine when he received the call.  *Id*. ¶ 65.  On the way to the scene, he requested that the state police barracks send another unit; he also asked Baker and State Game Warden David Chabot to respond as well.  *Id*.  Wainwright was told by dispatch that there was a rifle and a shotgun in the residence.  *Id*.  ¶ 66.  As he entered the residence, Wainwright saw two or three men and two women.  *Id*. ¶ 68.  Turner arrived at the residence and entered within twenty

to thirty seconds after Wainwright did.  *Id*. ¶ 69.[10]  At the time of his arrival, Turner had been told that Bennett had beaten a dog with a baseball bat and perhaps killed it and had threatened family members who desired the presence of law enforcement due to the threats.  *Id*. ¶ 71.  Turner and Wainwright spoke with the family members and were shown a door leading to the area where Bennett was.  *Id*. ¶¶ 73-74.

After the conversation, Wainwright and Turner told the family members that they must evacuate the house.  *Id*.¶ 81.  As the family was leaving, Wainwright heard a commotion from the area of the house where Bennett was.  *Id*. ¶ 82.  Arrangements were also made to evacuate a nearby neighbor.  *Id*. ¶ 84.

Once Miclon arrived on the scene, he was the ranking officer.  *Id*. ¶ 89.  He instructed the officers to remain inside the house in a defensive position and to wait for the Maine State Police tactical team to arrive.  *Id*. ¶ 90.  Davis arrived at the scene after Miclon had decided to call the state police tactical team; he became the ranking officer upon his arrival at the scene.  *Id*. ¶ 93.  He had information that there were weapons in the house.  *Id*. ¶ 94.  Davis confirmed Miclon's orders.  *Id*. ¶ 96.  Sergeant Madden of the Maine State Police instructed Turner to "hunker down and don't do anything aggressive" and told him that the tactical team would take over the scene when they arrived. *Id*. ¶ 99.[11]

Baker arrived after the family members had been evacuated.  *Id*. ¶ 100.  He originally brought his department-issued shotgun into the house, but it was later exchanged for a lighter long gun, an AR-15 owned by Wainwright and approved for use by Herrick.  *Id*. ¶ 101.  While in the house,

---

[10] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 69, but the denial does not address the facts set forth in that paragraph, which are supported by the record citation given and accordingly deemed admitted.

[11] The plaintiffs do not respond to this paragraph of the defendants' statement of material facts.  Because it is supported by the citation given to the summary judgment record, it is deemed admitted.

Wainwright, Baker and Turner took turns monitoring from the kitchen the threshold of the doorway between the kitchen and the living room, closest to the exit door, so that they could be alert if Bennett were to enter the living room. *Id.* ¶¶ 102,[12] 108.  While these officers maintained their position in the house, the state police tactical team began to assemble outside. *Id.* ¶ 111.

Davis, Wainwright, Miclon, Baker and Turner all believed that Bennett needed to be taken into protective custody. *Id.* ¶ 112.[13]  The intention of the officers in the house was to provide a safe entry point for the tactical team and the negotiator on that team. *Id.* ¶ 113.[14]  Miclon attempted to gather further information to assist the tactical team, including contacting the assistant district attorney to determine whether there was probable cause for the issuance of a warrant. *Id.* ¶ 118.[15] The assistant district attorney wanted more information. *Id.* ¶ 120.  Miclon informed Davis that he was going to talk with members of the family in order to get more information. *Id.* ¶ 121.  Miclon went to Hart's house, where she was waiting with her husband and Arlene. *Id.* ¶ 122.  While he was there, Miclon and Hart both attempted unsuccessfully to contact Bennett by telephone. *Id.* ¶ 123.  Hart, her husband and Arlene prepared two diagrams of the Bennett house which included a description of the location of weapons. *Id.* ¶ 124.

---

[12] The plaintiffs purport to deny paragraph 102 of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 102, but the paragraphs of their own statement of material facts which are cited, without any specific response to the defendants' factual assertions, do not address any of the factual assertions made in paragraph 102 of the defendants' statement of material facts, *see* Plaintiffs' SMF ¶¶ 46-47, which are accordingly deemed admitted because they are supported by the summary judgment material cited by the defendants.

[13] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 112, but the substance of the denial does not address the facts stated in the paragraph, which accordingly is deemed admitted.

[14] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 113, but the denial does not address the factual statements in the paragraph, which are supported by the citations given to the summary judgment record and accordingly deemed admitted.

[15] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 118, but the substance of the denial does not address the facts set forth in this sentence, which accordingly is deemed admitted.

Bennett briefly entered the living room on two occasions.  *Id*. ¶ 125.[16]  Wainwright told Bennett who he was and that the officers just wanted to talk with him to make sure he was all right. *Id*. ¶ 127.[17]  Wainwright asked Bennett to acknowledge that he could hear Wainwright, but Bennett never did so.  *Id*.  Baker knew that Bennett saw Baker with the AR-15.  Plaintiffs' SMF ¶ 427; Defendants' Request to Strike Portions of Plaintiffs' Response to Defendants Statement of Material Facts and Defendants' Reply to Plaintiffs' Statement of Additional Material Facts ("Defendants' Responsive SMF") (Docket No. 119) ¶ 427.  Baker never told Bennett that he was being taken into protective custody.  *Id*. ¶ 493.

Without warning, Bennett entered the room with a shotgun aimed at Baker.  Defendants' SMF ¶ 129; Plaintiffs' Responsive SMF ¶ 129.[18]  Bennett fired the shotgun.  *Id*. ¶ 131.[19]  Baker fired approximately five rounds from the AR-15.  *Id*. ¶ 132.  Wainwright fired a number of shots from his 40-caliber handgun and then reloaded.  *Id*. ¶ 133.  Immediately after the shooting ended, Wainwright called a "Signal 2000" and members of the sheriff's department and the state police immediately entered the building.  *Id*. ¶ 140.[20]  Sergeant Donald Shead from the Maine State Police immediately

---

[16] The plaintiffs purport to deny paragraph 125 of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 125, but neither the narrative provided by the plaintiffs nor the paragraphs of their own statement of material facts which they cite as authority for the denial, *see* Plaintiffs' SMF ¶¶ 151, 505-08, nor their response to paragraph 118 of the defendants' statement of material facts, which is incorporated by reference into their response to paragraph 125, addresses the facts stated in the text above, which are accordingly deemed admitted because they are supported by the citations to the summary judgment record given by the defendants.
[17] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, but the dispute is only about whether Wainwright talked, spoke, yelled or hollered.  Plaintiffs' Responsive SMF ¶ 117.  I have refrained from characterizing the decibel level of the speech.
[18] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 129, but the paragraphs of their own statement of material facts which are cited in support of the denial do not contradict the factual statements in paragraph 129, which is supported by the citation given to the summary judgment record and accordingly deemed admitted.
[19] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 131, but in the course of an extremely long denial incorporated therein by reference, they do not deny that Bennett fired the shotgun, *id*. ¶ 179.  They dispute the sequence of the shots.  *Id*. ¶ 131.  I draw no conclusions about the sequence of shots for purposes of this recitation of the facts.
[20] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 140, but they dispute only the time of day at which these events took place, not the fact that they occurred as stated.  The time of day is not set forth in this paragraph of the defendants' statement of material facts.

began performing cardiopulmonary resuscitation on Bennett. *Id*. ¶ 141.[21] Shortly thereafter, Bennett was transferred by ambulance to Stevens Memorial Hospital, where he was pronounced dead. *Id*. ¶ 142.

As sheriff of Oxford County, Herrick is the only individual with final decision-making authority at the Oxford County Sheriff's Department. *Id*. ¶ 187.[22] Neither Herrick nor Davis has ever been aware of the need for different or additional training for their officers, including those who are defendants in this case, in the area of searches, seizures, use of force, handling barricaded subjects, or dealing with mentally ill individuals. *Id*. ¶ 188. Oxford Count Sheriff's Department General Order 2-1 is the official policy and procedure of that department with respect to use of force and was in effect on January 20, 2000. *Id*. ¶ 192.[23] Oxford County Sheriff's Department General Order 2-3 is the official policy and procedure of that department regarding firearms use and was in effect on January 20, 2000. *Id*. ¶ 193. Oxford County Sheriff's Department General Order 2-16 is the official policy and procedure of that department regarding protective custody and was in effect on January 20, 2000. *Id*. ¶ 194. Oxford County Sheriff's Department General Order 2-15 is the official policy and procedure of that department with respect to handling barricaded subjects and was in effect on January 20, 2000. *Id*. ¶ 195.

## C.  Discussion of County Motion

The county defendants begin with the plaintiffs' claims for Fourth Amendment violations, presenting a variety of reasons why they contend that they are entitled to summary judgment on these

---

[21] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 141, but they dispute only factual assertions not included in this sentence.

[22] The plaintiffs' response to this paragraph of the defendants' statement of material facts does not begin with the word "admitted," "denied" or "qualified," Plaintiffs' Responsive SMF ¶ 187, as required by this court's Local Rule 56(c). The substance of the text following the number 187 in the plaintiffs' response does not address the factual assertions included in paragraph 187 of the defendants' statement of material facts, which are supported by the citation given and accordingly deemed admitted.

[23] The plaintiffs purport to deny this paragraph of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶ 192, but the denial does not address the factual statements made in that paragraph and appears to be addressed to the factual statements in (*continued on next page*)

claims.  County Motion at 11-24.  One of those reasons, raised by defendants Wainwright, Baker and Miclon, is an assertion that they are protected from these claims by the doctrine of qualified immunity.  *Id*. at  16-20.  I will address this argument first.

1.  *Qualified immunity*.  The doctrine of qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established  statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The First Circuit's three-step approach to qualified immunity claims asks:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

*Wilson v. City of Boston*, 421 F.3d 45, 52 (1st Cir. 2005).  "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Id*. at 58 (citation and internal quotation marks omitted).  Under the first prong, the court must ask whether the facts, "[t]aken in the light most favorable to the party asserting the injury  . . . show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court has directed that a trial court determine whether a constitutional violation has occurred prior to deciding whether qualified immunity applies.  *Id*. at 207.

Here, the county defendants contend that there was no constitutional violation because the law enforcement officers "had been invited into the home" and because "[t]here were exigent circumstances permitting them to be in the home regardless of consent and in the absence of a warrant."  County Motion at 16.

---

paragraph 191 of the defendants' statement of material facts.

### a.  Consent[24]

The county defendants contend that the plaintiffs gave them permission to enter the Bennett house; the plaintiffs dispute this.  Defendants' SMF ¶¶ 67, 70; Plaintiffs' Responsive SMF ¶¶ 67, 70; Plaintiffs' SMF ¶¶ 37, 47, 119; Defendants' Responsive SMF ¶¶ 37, 47, 119.[25]  Because the disputed versions of these factual assertions are appropriately supported by the citations given to the summary judgment record by the parties, direct summary judgment is not available on this basis with respect to the Fourth Amendment claims and the first prong of the qualified immunity test may not be satisfied by this evidence for purposes of summary judgment.

### b.  Probable cause and exigent circumstances

A law enforcement officer needs both probable cause and either a warrant or exigent circumstances to enter a person's home without permission.  *See generally United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005); *United States v. Mares*, 428 F.3d 64, 66 (1st Cir. 2005).  The county defendants contend that Wainwright, Baker and Miclon had probable cause to take Bennett into protective custody because they had probable cause to believe that he posed an immediate risk of substantial harm to himself.  County Motion at 12.  They also assert that they had probable cause to

---

[24] Under the heading "Summary judgment standard heightened care requirement when police kill the one who would contradict their story," Plaintiffs' Opposition at 4, the plaintiffs cite *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), for the proposition that "it is especially within the province of the jury, and not a reviewing court on summary judgment, to resolve issues of inconsistency, contradiction and motives which relate to those issues of fact and the inferences flowing therefrom," *id*. at 5.  Neither *Abraham* nor the case cited therein and also mentioned by the plaintiffs, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), imposes a "heightened care requirement" on summary judgment review in cases in which police defendants may have taken actions that resulted in the death of a plaintiff's decedent.  Nor does the First Circuit impose such an additional requirement, insofar as I am able to determine.

[25] The defendants have moved to strike paragraphs 37 and 47 of the plaintiffs' statement of material facts, on the ground, *inter alia*, that they are not supported by the references given to the summary judgment record.  Defendants' Responsive SMF ¶¶ 37, 47.  Contrary to the plaintiffs' assertion, Plaintiffs' OBJECTION to Defendants' Request to strike Plaintiffs' Response to Defendants' Statement of Material Facts, etc. ("Plaintiffs' Objection") (Docket No. 122) ¶ 37 at 68, the citations given by the plaintiffs in that paragraph cannot reasonably be read to support any factual assertion other than that Arlene Bedard did not let the officers into the house.  The request to strike paragraph 37 is accordingly GRANTED.  With respect to paragraph 47, the matter is less than clear; a contradiction is not necessarily present.  *See* Plaintiffs' Objection ¶ 47 at 69.  The request as to that paragraph is thus DENIED.  In any event, the remaining cited paragraphs suffice to establish a factual dispute on this point.

believe that Bennett had committed the crime of criminal threatening of a family member. *Id*. With respect to the first ground, Maine law provides:

> If a law enforcement officer has reasonable grounds to believe, based upon probable cause, that a person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial physical harm to that person or to other persons . . . the law enforcement officer:
>
> **A.** May take the person into protective custody; and
>
> **B.** If the law enforcement officer does take the person into protective custody, shall deliver the person immediately for examination as provided in section 3863[.]

34-B M.R.S.A. § 3862(1)(A)-(B).   The defendants contend that the following facts establish probable cause in this case for purposes of this statute:

> The officers knew that Bennett had walked from Buckfield to Sumner, a distance of approximately ten or more miles, in the midst of a snowstorm while wearing only slippers on his feet.   They knew that Bennett had bludgeoned a dog.   In addition to having been told that Bennett had beaten the dog with a bat, Wainwright could hear the dog making "an ungodly moaning."   In addition, Arlene Bedard had reported to dispatch that Daniel Bennett had threatened to kill her. While the law enforcement officers were at the house, Arlene stated that Daniel told her, "leave me the fuck alone, Ma, I don't want to kill you, too."   The officers understood the word "too" to mean "also" as a reference to the dog.   Wainwright and Turner both knew that Bennett had some history of mental health problems.   Finally, the officers knew that Bennett was refusing to speak with them, had secured himself in a different area of the dwelling, and had access to firearms.

County Motion at 12 (citations omitted).   The plaintiffs dispute some of these factual assertions and qualify others.   Specifically, they assert, in those portions of their denials or qualifications that are possibly responsive, that "[t]he dog was hit with a stick, not a bat," Plaintiffs' Responsive SMF ¶ 76 (incorporating by reference Plaintiffs' SMF ¶ 22e); and that they did not in fact feel threatened by Bennett, Plaintiffs' Responsive SMF ¶ 63 (incorporating by reference Plaintiffs' SMF ¶¶ 28, 53-54, all of which are disputed by the defendants, Defendants' Responsive SMF ¶¶ 28, 53-54).   The undisputed facts are sufficient to establish that the officers had probable cause to take Bennett into

protective custody.  It is accordingly unnecessary to consider the defendants' alternate probable cause argument.

Exigent circumstances exist "where there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *Fletcher v. Town of Clinton*, 196 F.3d 41, 49 (1st Cir. 1999) (citation and internal quotation marks omitted).  Exigent circumstances include "an imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence," including the person ultimately arrested or seized. *Buchanan v. Maine*, 469 F.3d 158, 168-69 (1st Cir. 2006) (citation and internal punctuation omitted).  "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 126 S.Ct. 1943, 1947 (2006).  The inquiry into the presence of exigent circumstances is "limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the [seizure]." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995).

The county defendants contend that the officers' knowledge of the following facts was sufficient to establish the existence of exigent circumstances:  "Bennett had beaten a dog, had threatened to kill his mother, was known to be mentally ill, and was known to have access to firearms." County Motion at 16.  The question presented is close, but I conclude that this information could reasonably lead the officers to believe that their presence inside the house was necessary to prevent injury to Bennett or to the family members present there.  The plaintiffs assert that "[n]o reasonable officer should have jumped to the conclusion that the mere presence of firearms allows the exigency of seizure without a warrant created by the perimeter."  Plaintiffs' Opposition at 16.  The reference to a perimeter is apparently the plaintiffs' characterization of Wainwright's alleged "determination that the roads and house should be sealed off to create a no go zone." *Id*. at 6. To the

extent that the plaintiffs' assertion is intelligible, the "mere presence of firearms" was not the only factor known to the officers bearing on their decision to enter the house. None of those factors is to be considered in isolation; it is the total constellation of factors that governs.

### c. Other alleged constitutional violations

The foregoing discussion addresses only the allegations that the officers' entry into the Bennett house itself constituted a constitutional violation. The plaintiffs apparently also contend that the creation of a perimeter around the house, the summoning of the police tactical team, the "forcing out" of the house of family members other than Bennett by the officers, the re-entry of officers into the house after the family members left, the pointing of guns at Bennett, the prevention of Bennett from using the bathroom and the shooting of Bennett were each separate and independent seizures in violation of the Fourth Amendment. Plaintiffs' Opposition at 16-20. The plaintiffs cite, *id.* at 6, the definition of a seizure from *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989): "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen[.]'" [Citation omitted.] Neither the establishment of a perimeter around a building, restricting certain individuals from entering that building or area, nor the summoning of a particular police team could reasonably be characterized as a seizure. The re-entry of officers into the house after the plaintiffs were escorted out was not a constitutional violation for the same reasons their initial entry was not such a violation.

Removing the family members[26] from the house, assuming that this was accomplished against their will, was not a seizure of the individuals. Their "liberty" was not restricted with the exception that they could not remain inside the house or go back into the house. A "seizure" involves a much more significant restriction on an individual's liberty. Arlene Bedard and Isabelle Bedard were certainly free to leave. A person's reasonable belief that she is not free to leave is "a *necessary*, but not a *sufficient*, condition for seizure[.]" *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (emphasis in original). The plaintiffs make no factual allegations to the effect that either Arlene

---

[26] As noted, the plaintiffs have apparently abandoned any claim by plaintiff Laurie Hart in this regard. Plaintiffs' Opposition at 9 ("Plaintiffs Arlene Bedard and Isabelle Bedard and the Estate have pressed a claim for search and seizure for being forced out of their home."). There is no sense in which the estate may press such a claim. If the plaintiffs mean to refer to a seizure of Bennett for which the estate may assert a claim, the facts presented in the summary judgment record do not demonstrate that Bennett was "forced" to leave the house. There is no sense in which being "forced" out of one's home constitutes a search within the meaning of the Fourth Amendment.

Bedard or Isabelle Bedard had such a belief, let alone any factual allegations that would have rendered such beliefs reasonable.

However, the plaintiffs also allege that there was a seizure of the house, Plaintiffs' Opposition at 10, and here they fare somewhat better. There was a meaningful interference with the possessory interests of Isabelle Bedard, the owner and resident, and Arlene Bedard, a resident, in the house, such that each woman's Fourth Amendment rights were implicated. *See Higgins v. Penobscot County Sheriff's Dep't*, 2005 WL 1331200 (D. Me. June 2, 2005), at *9-*10 (rec. dec., aff'd by Order on Report and Recommended Decision, Docket No. 04-157-B-W (Docket No. 44), Aug. 14, 2005). There was a seizure in this sense.

For the reasons discussed above with respect to Arlene Bedard and Isabelle Bedard, merely preventing Bennett from using the bathroom — if in fact that happened — cannot reasonably be characterized as a seizure. The paragraphs of their statement cited by the plaintiffs in support of this claim — Plaintiffs' SMF ¶¶ 5, 492, Plaintiffs' Opposition at 10 — establish only that the side of the house where Bennett lived had no heat and that Baker did not know that Bennett had no access to a bathroom.

Finally, the pointing of a gun at Bennett and the shooting of Bennett may constitute violations of the Fourth Amendment. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995); *McKenzie v. Lamb*, 738 F.2d 1005, 1010-11 (9th Cir. 1984).

### d. Whether these constitutional rights were clearly established

For the three events that may have been constitutional violations — seizure of the house, pointing a gun at Bennett and shooting Bennett — the second prong of the qualified immunity analysis comes into play. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must

be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The only rights which the plaintiffs discuss with respect to this prong are "[t]he right not to be arrested without probable cause or have one's home searched without probable cause."  Plaintiffs' Opposition at 13.  I have already determined that there was probable cause to take Bennett into protective custody, so that the question of probable cause to arrest is not reached.  The plaintiffs do not support their assertion that the house was searched, as opposed to seized, with any citations to their statement of material facts.  *Id*. at 13, 24. Accordingly, I will not consider further any claim that the house was searched by any of the defendants.

The plaintiffs' failure to address the question whether any of the other Fourth Amendment violations they allege concern clearly established constitutional rights does not mean that the question may be decided against them in the context of a motion for summary judgment.  *Cordero-Soto v. Island Fin., Inc.*, 418 F.3d 114, 118 (1st Cir. 2005).  The court must still inquire whether the moving party has met its burden to demonstrate its entitlement to summary judgment as a matter of law.  *Id*.

Magistrate Judge Kravchuk of this court concluded in *Higgins* that any constitutional right involved in that case in the seizure of a residence — a seizure that extended far longer and was more extensive than the seizure in this case — was not clearly established in 2002.  2005 WL 1331200 at *13-*14.  I find her reasoning persuasive for purposes of the instant case, where the relevant events took place in 2000.  Summary judgment on any Fourth Amendment claim based on the seizure of the house is therefore appropriate.

The case law cited by the plaintiffs in support of their argument that the mere pointing of a gun at Bennett constitutes a constitutional violation, Plaintiffs' Opposition at 11, where it relates to the pointing of a gun at all, involves circumstances in which the court relied on a constellation of events,

not just the pointing of a gun.  The plaintiffs have cited no authority for the proposition that a constitutional right not to have a gun pointed at a person was clearly established at the relevant time, and my research has located none.  Indeed, such a standard would subject fairly routine police work to qualified immunity analysis so frequently as to threaten to overwhelm court dockets.  I conclude that the defendants are entitled to summary judgment on any such claim.

With respect to the shooting of Bennett, the plaintiffs offer no evidence that any defendant other than Baker and Wainwright was involved.  Defendants' SMF ¶¶ 158-60,[27] 163; Plaintiffs' SMF ¶¶ 158, 162, 167, 434-45.[28]  Accordingly, the other individual county defendants (Miclon, Davis and Herrick) are entitled to summary judgment on any direct claim arising from the shooting.

I conclude, with respect to Baker and Wainwright, that the right not to be shot in one's own home under most circumstances was clearly established in 2000.  This general conclusion is not enough, however, to resolve the issue at the second-prong stage.  The second-prong analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Wilson*, 421 F.3d at 56 (citation and internal quotation marks omitted), and, given this need for specificity, the bases for the determinations under the second and third prongs of the qualified immunity analysis often overlap, *Savard v. Rhode Island*, 338 F.3d 23, 27 (1st Cir. 2003).  In this regard, the defendants direct their argument to the third prong of the qualified immunity standard: whether an objectively reasonable law enforcement officer would have believed that the shooting by Baker and Wainwright violated that clearly established right.  County Motion at 20-23.  The shooting of Bennett presents a classic case of

---

[27] The plaintiffs purport to deny each of these paragraphs of the defendants' statement of material facts, Plaintiffs' Responsive SMF ¶¶ 158-60, but the denials do not contend that any other defendant fired at Bennett.

[28] The plaintiffs do allege that "Wainwright, upon questioning, stated that Baker and Turner had fired." Plaintiffs' SMF ¶ 172. However, the defendants have requested that this paragraph be stricken, Defendants' Responsive SMF ¶ 172, on the grounds that it is not supported by the cited portion of the summary judgment record.  The citation is to pages 53-54 of the transcript of an interview of Wainwright dated January 21, 2000.  Plaintiffs' SMF ¶ 172.  In fact, Wainwright's statement in that document is the following:  "At that point they wanted to know who was involved, and I said Tim [Turner], Tim and Matt [Baker] and myself.  And then Tim said he didn't fire, so that's, I, I guess at that point is I found out Tim hadn't fired." [Transcript], Exh. 10 to Docket No. 77, at 54.  This (*continued on next page*)

second and third prong overlap in the context of qualified immunity, and I will consider the two together.

### e.  Objectively reasonable belief

The defendants' argument is based almost entirely on the assertion that Baker's and Wainwright's use of deadly force was reasonable because they were "facing the threat of deadly force."  County Motion at 22-23.  This assertion is based, in turn, on factual allegations that are disputed by the plaintiffs.  Defendants' SMF ¶¶ 129-31, 134-35, 137-38, 156-58, 168-73; Plaintiffs' Responsive SMF ¶¶ 129-31, 134-35, 137-38, 156-58, 168-73.  The defendants have requested the court to strike the plaintiffs' responses to all of the cited paragraphs.  Defendants' Responsive SMF ¶¶ 129-31, 134-35, 137-38, 156-58, 168-73 at 11-20.

With respect to paragraph 129, the purported denial does not rely on asserted facts that contradict the statement originally made; rather, the plaintiffs attempt to argue that the factual statement should not be credited because Baker changes his testimony in another respect.  Plaintiffs' Objection ¶ 129 at 29.  This is not an effective denial and the request to strike the denial is granted.

The plaintiffs take the same approach with paragraph 130.  Plaintiffs' Objection ¶ 130 at 29.  The same result is required; the request to strike the denial is granted.  With respect to paragraph 131, the plaintiffs' denial relies on a misreading of the testimony of Baker that is discussed in footnote 28 above, and the request to strike that denial is granted as well.

With respect to paragraph 134, the request to strike is denied; there is some demonstrated confusion, although minimal, that might allow a reasonable factfinder to conclude that the sequence of shots was not that presented by the defendants.  The rules of summary judgment require that the benefit

---

cannot reasonably be characterized as a statement that  "Baker and Turner had fired."  The request to strike is GRANTED.

of all reasonable inferences be accorded the non-moving party, and I do so with respect to this paragraph.

The plaintiffs' denial of paragraph 135 is replete with unresponsive assertions and argument. Plaintiffs' Responsive SMF ¶ 135 (incorporating ¶¶ 179 & 181). There is a dispute as to whether Wainwright knew that Bennett's weapon was a single-shot shotgun, but the statement in paragraph 135 is only that both Wainwright and Baker believed that Bennett was firing at them. Defendants' SMF ¶ 135. None of the citations given support the plaintiffs' assertion that "Baker reasonably knew Dan had an unloaded gun and could not fire." Plaintiffs' Responsive SMF ¶ 135. The request to strike the denial of paragraph 135 is granted.

The defendants request the court to strike the plaintiffs' denial of paragraph 137 because it is based on speculation, not based on personal knowledge and offers unqualified lay opinion. Defendants' Responsive SMF ¶ 137 at 12-13. While some of the assertions in the plaintiffs' lengthy denial, Plaintiffs' Responsive SMF ¶ 137, are not supported by the citations given to the summary judgment record, and the denial begins with an unfortunate and inappropriate attack on Wainwright's credibility, enough of a dispute is raised by the denial to require that the request to strike be denied. The parties deal with their dispute about the plaintiffs' denial of paragraph 138 by incorporating their arguments with respect to paragraph 137, and my ruling accordingly is the same.

With respect to paragraph 156, the defendants correctly point out, Defendants' Responsive SMF ¶ 156 at 17, that the plaintiffs' purported denial does not address the substance of that paragraph, *compare* Defendants' SMF ¶ 156 *with* Plaintiffs' Responsive SMF ¶ 156. The request to strike the denial of this paragraph is granted. As to paragraph 157, the same is true. The fact that Baker "changed his story," Plaintiffs' Responsive SMF ¶ 157, as to facts not included in paragraph 157 does not means that his otherwise uncontradicted assertion must be rejected. The same is also true of

33

paragraph 158; a denial based on the assertion that "Plaintiffs maintain Defense not credible as to scenario," *id*. ¶ 158, is simply insufficient.  The request to strike the denials of paragraphs 157 and 158 is granted.

With respect to paragraph 168, the plaintiffs have not raised a factual dispute as to whether Wainwright could reasonably have believed that Bennett was not able to reload; they have only established a dispute as to whether Wainwright reasonably could have believed that Bennett was able to fire more than once before reloading.  *Id*. ¶ 168.  They do not address at all the defendants' assertion that Wainwright yelled what is alleged in paragraph 168.  The request to strike this denial is granted.  The plaintiffs' denial of paragraph 169 does not address its substance at all, *id*. ¶ 169, and the request to strike that denial is also granted.

The plaintiffs' denial of paragraph 170 rests on assumptions that are not supported by the citations they give to the summary judgment record, specifically, the assumptions that Wainwright was aware of Bennett's injuries and their severity immediately after they occurred and that all of Bennett's injuries were caused by the first round of gunfire.  *Id*. ¶ 170.  The request to strike the denial is granted.  The plaintiffs' denial of paragraph 171 is not supported by the citations given and the request to strike it is granted.  Paragraph 172 is identical to paragraph 168.  It bears repeating that paragraph 172 states what Wainwright believed, and that is the issue, not whether that belief was objectively wrong.  The denial of paragraph 173 suffers from the same infirmities as the denials of paragraphs 170 and 171.  The request to strike these denials is granted.

The striking of many of the denials relevant to the qualified immunity issue leaves the plaintiffs without enough on which to base their Fourth Amendment claims against Baker and Wainwright.  It is essentially uncontested that Bennett entered the living room while aiming a shotgun at Baker, Defendants' SMF ¶¶ 129 & 156, that Baker yelled to Bennett, "Danny, drop the gun," *id*. ¶ 130, that

34

Bennett did not do so, *id*. ¶ 157, and that Bennett fired the shotgun, *id*. ¶ 131.  Baker and Wainwright both believed that Bennett was firing at them.  *Id*. ¶ 135.  After Bennett had fired the shotgun, Wainwright believed that Bennett was reloading his gun and yelled, "he's getting his gun, he's trying to get his gun." *Id*. ¶ 172.  Under these circumstances, Wainwright and Baker did have an objectively reasonable belief that they were facing the threat of deadly force.  Accordingly, no objectively reasonable law enforcement officer would have believed that the shooting of Bennett violated any clearly established constitutional right.  *See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.").  This is so even if, as the plaintiffs contend, both Baker and Wainwright knew that the only operable weapon available to Bennett was a single-shot shotgun, Plaintiffs' SMF ¶¶ 60-62, and Wainwright, but not Baker, had the nickname "Deputy Death," *id*. ¶¶ 847-48, 896, 908.  *See Napier v. Town of Windham*, 187 F.3d 177, 184-88 (1st Cir. 1999).

*2. Substantive Fourth Amendment Claims*.  No direct claims against Wainwright and Baker under the Fourth Amendment remain after the foregoing qualified immunity analysis.

*3. Equal protection*.  If the court accepts my recommendation with respect to the county defendants' motion for judgment on the pleadings, the equal protection claim as to Miclon, Davis, Herrick and the county remains to be addressed in connection with the motion for summary judgment.  The defendants contend that the plaintiffs cannot show that Bennett was treated differently from any other person similarly situated.  County Motion at 24-25.  The plaintiffs' response, to the extent that I can understand it, argues that Bennett was a member of "a class of mentally ill persons" and was shot because he was mentally ill.  Plaintiffs' Opposition at 31-32.  They do not identify the comparison

group that they allege was similarly situated.  If they mean to identify all mentally ill persons in Maine as that group, the statistics they cite demonstrate only that the mentally ill as a group state-wide are justifiably shot by law enforcement personnel at a rate significantly higher than that of the general population, a statistic that is not surprising.  They offer no comparison between Bennett and this group.  They assert that two mentally ill individuals were shot and killed by Wainwright, but they do not compare Bennett to the other such victim nor do they compare either or both to mentally ill individuals killed by Maine law enforcement personnel.

Mental illness is not a suspect classification for purposes of equal protection claims.  *D. W. v. Rogers*, 113 F.3d 1214, 1219 (11th Cir. 1997); *United States v. Lane*, 815 F.2d 1106, 1110 n.7 (7th Cir. 1987).  Accordingly, if the plaintiffs' claim could be analyzed, "rational basis" review would be applicable; that is, the allegedly disparate treatment would be constitutional if any state of facts could reasonably be conceived to justify it.  *Rogers*, 113 F.3d at 1219.  The problem for the plaintiffs here is that it is not clear from their memorandum just what action or actions constituted the allegedly disparate treatment nor who the individuals situated similarly to Bennett are alleged to have been.  On the showing made, the remaining county defendants are entitled to summary judgment on this claim.

*4. Denial of medical care*.  The complaint alleges in Count I that all of the defendants "fail[ed] to provide adequate medical care."  Complaint ¶ 46[2].  To the extent that this claim is distinct from the plaintiffs' due-process claims as discussed above and their emotional-distress claims, the county defendants contend that they are entitled to summary judgment on this claim because there is no evidence that any of them failed to provide medical care to Bennett, "nor is there any evidence that different medical care would have yielded another result."  County Motion at 26.  The plaintiffs do not respond to this argument.

"The Due Process Clause . . . does require the responsible government or governmental agency to provide medical care to persons  . . . who have been injured while being apprehended by the police." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).  The governmental agency must ensure that the medical care needed is in fact provided.  *Id.* at 245.  Here, the plaintiffs deny that Sergeant Donald Shead from the Maine State Police "immediately" began performing cardiopulmonary resuscitation on Bennett after the shooting ended.  Defendants' SMF ¶¶ 140-41.  However, they do not provide citations to any factual allegations that could reasonably be read to provide evidence about what medical care was needed by Bennett at the time that was not provided by the defendants.  On the showing made, the county defendants are entitled to summary judgment on this claim.

5.  *Conspiracy*.  The county defendants do not mention the plaintiffs' conspiracy claim, Complaint ¶ 46c[2], in their motion.  It is not clear whether they mean their qualified immunity argument to apply to this claim as well, but that argument appears in a subsection under the section title "Legal Argument - Fourth Amendment Search and Seizure."  County Motion at 11, 16.  The complaint places this claim in Count I, under the heading "42 USC Section 1983."  Complaint at 15 & ¶ 46c[2].[29]  As stated, the claim is not properly characterized as a Fourth Amendment claim, as is true of many of the other claims included by the plaintiffs in Count I, nor does it merely allege a conspiracy to cover up wrongdoing.  Conspiracies are actionable under section 1983.  *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006).  While such claims are brought under the rubric of due process, the defendants do not suggest why or how their due-process arguments should apply to the conspiracy alleged in paragraph

---

[29] The plaintiffs assert that "Plaintiff [sic] has alleged a violation of the State Civil Rights Act for conspiracy to deprive the plaintiffs of the aforesaid civil rights, to commit the tort of trespass and violations of federal and state rights," Plaintiffs' Opposition at 3, but the only allegations of conspiracy in the complaint appear to allege violations of federal law and the only specific claim appears under the heading "Count I – 42 USC Section 1983," Complaint at 15 & ¶¶ 27[i] & 46c[2].  The complaint cannot reasonably be read to assert a conspiracy claim under state law.

46c[2] of the complaint.  In any event, no separate federal constitutional claim remains in this case to provide the necessary basis for a section 1983 conspiracy claim, *id.*, and the defendants are accordingly entitled to summary judgment on this claim as well.

6.  *Supervisory liability*.  The plaintiffs concede that their claims based on failure to supervise and failure to train are applicable only to Herrick and the county.  Plaintiffs' Opposition at 32.  To the extent that such claims appear to be asserted against any other defendants in the complaint, those defendants are entitled to summary judgment on those claims.

> It is established law that

> a supervisor . . . may be liable under section 1983 if he formulates a policy or engages in a practice that leads to a civil rights violation committed by another.  Notice is a salient consideration in determining the existence of supervisory liability.  Nonetheless, supervisory liability does not require a showing that the supervisor had actual knowledge of the offending behavior; he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.

> To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk.  This formulation correctly implies that deliberate indifference alone does not equate with supervisory liability; a suitor also must show causation.  In other words, the plaintiff must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission.  This affirmative connection need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct.

*Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998) (citations and internal quotation marks omitted).  Here, the county defendants assert that, other than Wainwright, no employee of the Oxford County Sheriff's Department had ever been involved in a shooting or accused of using excessive force.  County Motion at 27-28.  They contend that appropriate policies regarding the use of force were already in place.  *Id*. at 28.

The plaintiffs respond that Herrick and the county (i) "have violated plaintiffs' rights by a pattern and practice of use of arrest in affecting [sic] protective custody seizures" demonstrating a failure to train their personnel adequately and deliberate indifference to an unspecified "known risk;" (ii) knew that Wainwright "has a proclivity to precipitate death by his actions as a Deputy" as shown by the settlement of a wrongful death claim arising out of his shooting of one Gonzales, yet Herrick promoted Wainwright and gave him "control over dangerous weapons that allowed him to kill Dan Bennett;" and (iii) decided "to facilitate the advancement of paramilitary styles to the O[xford] C[ounty] S[heriff's] O[ffice] . . . result[ing] in a pattern or practice of the excessive use of force, especially in mental health extractions and was the driving force of the AR15 being there and being used." Plaintiffs' Opposition at 36-37.

As to the first assertion, to the extent that it is sufficiently specific to state a cognizable claim, the plaintiffs offer insufficient evidence to allow a reasonable factfinder to conclude that a "pattern and practice" exists of the use of arrests in taking individuals into protective custody. The only factual statement cited by the plaintiffs in support of this assertion is paragraph 19 of their statement of material facts, *id*. at 37, which states: "The use of arrest and jail on mental health responses by the O[xford] C[ounty] S[heriff's] O[ffice] was a policy of OCSO in dealing with the mentally ill and Dan," Plaintiffs' SMF ¶ 19. The defendants have asked the court to strike this paragraph because the cited references do not support the statement. Defendants' Responsive SMF ¶ 19. Of course, a "policy of dealing with" Bennett alone would not be sufficient to show a pattern or practice for purposes of the supervisory liability claim. The first cited authority, the affidavit of plaintiff Arlene Bedard, establishes only that Bennett had previously been arrested by a deputy sheriff when she called the sheriff's office "for a mental health transport" and that she had been told by defendant Miclon that he could not "take [Bennett] in unless [he] had committed a crime." Affidavit of Arlene Bedard

(Attachment 1 to Docket No. 77) ¶¶ 5, 7-8.  This is not evidence of the alleged general policy.  The next cited authority, Arlene Bedard's statement to the attorney general's investigator, involves the same single episode.  [Transcript of Interview] (Attachment 2 to Docket No. 77) at 25-26.  The third cited authority, the plaintiffs' answers to interrogatories, refers again to the single incident involving Bennett and asserts in conclusory fashion that "[t]he use by OCSO of Turner as part of its overall policy of using arrests and force in mental health admissions is consistent with the de facto and de jure policy of arrest and force as the means of response to mental health reports by dispatch."  Plaintiff's [sic] Answers to Interrogatories Propounded by Oxford County Defendants (Docket No. 78) at 38 (incorporated by reference in responses on cited pages 39-40).  There is no showing in the interrogatory answer as to any basis for or source of the knowledge on the part of any of the plaintiffs allowing them to essentially testify to this "fact."  Particularly when the interrogatory answers begin with a general disavowal by the plaintiffs of a full understanding of those answers and the statement that "the legal theories and the Answers about [the interrogatories] are provided to us [by our lawyer] by way of explanation of the facts we know," *id*. at 1, this assertion is not of evidentiary quality and must be disregarded.  The next cited authority, another set of interrogatory answers, refers to one other incident in Oxford County that involved the shooting of a mentally-ill individual and suffers from the same infirmities as the first-cited interrogatory answer.  Plaintiff's Response to Defendant Turner's First Set of Interrogatories Propounded to Plaintiff (Docket No. 79) at 12-13.  The next cited authority is the affidavit of April Chrissikos in which the affiant states, without any attempt to set forth the source of her knowledge or her qualifications for making the assertion, that "[t]he shooting of [her son, Albert Gonzales, by Wainwright] was part of a policy by the Oxford County Sheriff's Office to treat mentally ill people with disproportionate force and without proper training or regard for the mentally ill person's safety."  Affidavit of April Chrissikos ("Chrissikos Aff.') (Docket No. 81) ¶ 4(c).  This

assertion, as presented, is not of evidentiary quality. The next cited authority is apparently a reference to the plaintiffs' disclosure of the expected testimony of their trial witnesses. Plaintiff's Supplemental Disclosure Production of Documents re Gonzales ("Supp. Disc.") (Attachment 1 to Docket No. 81). The plaintiffs cite only pages 1-2 of that document in general, Plaintiffs' SMF ¶ 19, and the only specific reference I see is an assertion that April Chrissikos will testify "as to the policy of OCSO, which was well known to the County to use force and to escalate the use of force against mentally ill persons as part of their overall policy of dealing with the mentally ill," Supp. Disc. At [2]. This statement is not sworn and is not that of Chrissikos; it is not of evidentiary quality. Finally, the plaintiffs cite the affidavit of an expert witness and a "briefing paper" entitled "Law enforcement and people with severe mental illness," neither of which so much as mentions the Oxford County Sheriff's Department. Affidavit of Charles Robinson, PHD (docket No. 83) & Attachment 5 thereto.

The evidence cited by the plaintiffs in support of their sweeping third assertion simply does not support it. *See* Plaintiffs' SMF ¶¶ 293, 549, 550, 758.[30] I will not consider the plaintiffs' first and third arguments on this point any further. With respect to the second argument, it will be necessary to address the defendants' requests to strike certain paragraphs of the plaintiffs' statement of material facts.

The plaintiffs cite the following paragraphs of their statement of material facts in support of their second argument: 308-12, 550, 846-51,[31] 894-99. Plaintiffs' Opposition at 36-37. The defendants have requested the court to strike all of these paragraphs. Defendants' Responsive SMF ¶¶ 308-12, 550, 846-51, 894-99. In each case, one of the grounds asserted for the request to strike is that the paragraph is "immaterial to the involvement of Defendant Turner." *E.g.*, *id*. ¶ 308. The

---

[30] The plaintiffs also cite three law review articles in support of this argument. Plaintiffs' Opposition at 37. Such articles are not admissible evidence nor do they offer any factual evidence relevant to this case.

[31] Given the context, I assume that the plaintiffs mean to cite the first set of paragraphs in their statement of material facts numbered (*continued on next page*)

paragraphs are being considered here in connection with the claims for supervisory liability, which do not involve Turner.  The paragraphs at issue do not mention Turner.  They will not be stricken for this asserted reason.

The defendants contend that paragraphs 308-12 are "based on hearsay and an unauthenticated document."  *Id*. ¶¶ 308-12.  The document cited by the plaintiffs in support of these paragraphs is an attachment to the affidavit of April Chrissikos, entitled "Interview with Chris Wainwright" and consisting of paragraphs bearing the titles "Statements Regarding 'Deputy Death,'" "Statements Regarding his Reputation," and "Statements About Being Relieved About the Gun Being Loaded," each of which is followed by a paragraph or paragraphs beginning "Chris:" and each of which is followed by the statement: "Hard Copy to be Notarized by: Amy C. Herrick, Notary Public, Commission Expires: August 27, 2001."  Attachment 4 to Chrissikos Aff.  As presented, the document appears to be unauthenticated — its source is not identified — and hearsay.  The plaintiffs assert that the document is not hearsay because it is a statement of a party opponent, Plaintiffs' Objection ¶ 307, taking it outside the definition of hearsay, Fed. R. Evid. 801(d)(2).  Even if that were the case, the document must be authenticated as a statement actually made by Wainwright.  Nothing on the face of the document does this.  The plaintiffs apparently contend that the document is authenticated by the Chrissikos affidavit "as the proper foundation was provided in the Chrissikos Affidavit and in the change of custody provided in the Chrissikos Affidavit at . . . p. 1 and p.2."  Plaintiffs' Objection ¶ 307.  However, neither of those single-spaced pages of the affidavit authenticates the document.  The request to strike paragraphs 308-12 is granted.

The defendants other than Turner admit paragraph 550, Defendants' Responsive SMF ¶ 550, and I have rejected Turner's request that it be stricken as to him.  Accordingly, it is undisputed that

---

846-51, at pages 169-71, rather than the second set so numbered, at pages 176-77.

"Davis knew that he approved the use by Wainwright of his private AR-15 because 'no one carried any firearm that was not approved.'" Plaintiffs' SMF ¶ 550.

Paragraphs 847 and 849 of the plaintiffs' statement of material facts are based on the same document, Plaintiffs' SMF ¶¶ 847, 849, and the motion to strike them is granted for the same reasons. Paragraph 846 is based on paragraph 4(e) of the Chrissikos affidavit. *Id*. ¶ 846. The defendants argue that this paragraph of the affidavit is "not based on personal knowledge, contains speculation, and is little more than the assertion of the affiant's opinions[.]" Defendants' Responsive SMF ¶ 846. The plaintiffs' response incorporates their response to the defendants' request to strike paragraph 842 of their statement of material facts, Plaintiffs' Objection ¶ 846, but that response does not address the specific objections made to paragraph 4(e) of the affidavit.[32] The remainder of the plaintiffs' response does not make paragraph 4(e) of the affidavit reliable as evidence; that paragraph presents the affiant's personal views and interpretation of evidence, not direct evidence. The request to strike paragraph 846 is granted. Paragraph 848 also relies on paragraph 4(e) of the Chrissikos affidavit. The request to strike it is granted for the same reasons.

The defendants contend that paragraph 850 should be stricken because paragraph 4(f) of the Chrissikos affidavit, one of three sources cited in its support, "is based on a demand and tape that both contain hearsay and have not been authenticated." Defendants' Responsive SMF ¶ 850. The plaintiffs' objection to the requests to strike contains no entry numbered 850, but does contain two entries numbered 849, Plaintiffs' Objection at 156-57, and I will treat the second as intended to respond with respect to paragraph 850. The plaintiffs contend that "[i]n light favorable to the Plaintiff [sic] authentication has occurred as to both the tape and the demand," which are also the second and third sources cited by the plaintiffs in support of the paragraph, Plaintiffs' SMF ¶ 850, in the

---

[32] The reference to paragraph 111 of the plaintiffs' objection in this response addresses only the Turner objection to this paragraph, (*continued on next page*)

Chrissikos affidavit, Plaintiffs' Objection at 157.  The objection relies on sources of authentication outside the affidavit and not cited in the original presentation of this paragraph.  In addition, the Chrissikos affidavit does not authenticate a tape or the fragment of the demand letter that is attached to it.  However, the demand letter fragment is authenticated by the cited pages of the deposition of Thomas Carey.  [Deposition of] Thomas Carey, Esq. (Docket No. 107) at 32-34.  Because that fragment supports the factual assertions in paragraph 850, the request to strike it is denied.

The defendants request that paragraph 851 be stricken because paragraph 4(g) of the Chrissikos affidavit, the only cited authority, Plaintiffs' SMF ¶ 851, "is not based on personal knowledge, contains speculation and is no more than the assertion of the affiant's opinion," Defendants' Responsive SMF ¶ 851.  On its face, paragraph 4(g) of the affidavit does appear to be based on personal knowledge and does not appear to offer speculation.  On the basis of the reasons given for the request to strike, the request is denied as to paragraph 851.

The only request to strike paragraph 894 is on the basis that it is immaterial as to Turner.  Defendants' Responsive SMF ¶ 894.  For the reasons already stated, this request is denied.  As to paragraphs 895-96, the defendants contend that they are "based on the recollection of a third party of a tape which has not been authenticated" and that "Wainwright's nickname is immaterial[.]" *Id.* ¶¶ 895-96.  Since the tape itself is not cited as the source for these two paragraphs, there is no need for the tape itself to be authenticated.  The materiality of the facts alleged will be considered below.  The request to strike these two paragraphs is denied.

The defendants attack paragraph 897 as immaterial.  *Id*. ¶ 897.  The request to strike this paragraph is denied.

---

which I have already discussed.

As to paragraph 898, the defendants assert that it is not supported by the provided reference to the summary judgment record. *Id.* ¶ 898. The question whether Attorney Carey "put this information in the negotiations" or merely "can't believe he wouldn't have put this information in," *id.*, makes no difference whatsoever for purposes of my analysis of the issue of supervisory liability. I therefore deny the request to strike paragraph 898.

The defendants' numerous proffered reasons for striking paragraph 899, *id.* ¶ 899, again have no effect on my analysis and I therefore deny the request to strike.

At best, the plaintiffs' evidence on the second argument in support of their supervisory-liability claim, much of it disputed, is that Davis had approved Wainwright's use of Davis's AR-15 on the date in question; that Wainwright was involved in the previous shooting and death of a mentally ill man; that individuals involved in litigation arising out of that death used Wainwright's nickname of "Deputy Death" in negotiations on that claim; that Wainwright was known prior to 2000 as "Deputy Death" "because of his character that of instigating and encouraging risks leading to deaths;" and that a tape of an interview of Wainwright by the Attorney General's Office that included a discussion of this nickname was a "Rosetta Stone" type of discovery for the attorney involved in that case and startled the attorney. Plaintiffs' SMF ¶¶ 550, 850-51, 894-99. Even if the plaintiffs' view of the evidence is credited, however, it is insufficient as a matter of law to establish supervisory liability. While the necessary causal link "may . . . be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations," *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994), "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference," *id*. Here, the plaintiffs offer only one somewhat similar, isolated instance. They do not offer any evidence that the "Deputy Death" nickname arose from circumstances sufficiently similar to

45

those involved in this case to have put Wainwright's supervisors on notice that he was creating "ongoing violations" of the constitutional rights of members of the community with whom he came in contact in the course of his official duties. Herrick is entitled to summary judgment on any supervisory liability claim.

With respect to the county itself, the plaintiffs must demonstrate either that the shooting of Bennett, if it was a constitutional violation, occurred pursuant to an official policy of the county which itself was unconstitutional or that it resulted from a pattern or practice of widespread and pervasive unconstitutional conduct of which those with final decision-making authority knew or should have known. *Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 690 (1978) (official policy); *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (pattern or practice). The plaintiffs suggest that Herrick's alleged failure to act "itself constitutes a policy for purposes of § 1983 liability," Plaintiffs' Opposition at 33, but the only alleged failure identified by the plaintiffs and available for consideration in this regard, the "proclivity" of Wainwright to "precipitate death" as demonstrated by a single incident,[33] cannot be considered "widespread and pervasive." The plaintiffs do not contend that any official policy of the county that was itself unconstitutional had a causal connection to Bennett's death. Accordingly, the county is also entitled to summary judgment on the supervisory liability claims.

7. *State-law claims*. Count II asserts claims under the Maine Civil Rights Act, specifically 5 M.R.S.A. § 4682. Complaint ¶¶ 48-50. The county defendants provide no separate argument with respect to these claims, relying on their assertion that the state statute "is coextensive with civil rights claims brought pursuant to 42 U.S.C. § 1983." County Motion at 7 n.1. "A conclusion that the

---

[33] The plaintiffs include in their statement of material facts, but do not cite in this portion of their memorandum of law, assertions that Wainwright "had previously been sued for false arrest," Plaintiffs' SMF ¶ 192, and had been investigated "for turning a blind eye on drug transactions," *id.* ¶ 199. Neither of these factual allegations is sufficiently similar on its face to the events giving rise to this action (*continued on next page*)

defendant[ is] not liable under 42 U.S.C. § 1983 also disposes of the plaintiff's claims under 5 M.R.S.A. § 4682[.]"   *Dimmitt v. Ockenfels*, 220 F.R.D. 116, 123 (D. Me. 2004).   The county defendants are entitled to summary judgment on Count II to the same extent as they are entitled to summary judgment on Count I.

### D.  Discussion of Turner Motion

I turn to Turner's motion for summary judgment with respect to those claims not addressed by his motion to dismiss.  He raises three issues not mentioned by the county defendants and five issues that have been addressed above.

*1.  Shared issues*.  Claims on which Turner seeks summary judgment which were included in the county defendants' motion for summary judgment  are (i) alleged violations of equal protection, (ii) Fourth Amendment claims, (iii) allegations of failure to provide medical care,  (iv) an allegation of illegal quartering, and (v) qualified immunity.

#### a.  Equal protection

Turner adopts the county defendants' arguments with respect to the plaintiffs' equal protection claims.  Turner Motion at 18 n.12.  For the reasons stated in my analysis of those arguments, Turner is also entitled to summary judgment on any equal protection claims.

#### b.  Failure to provide medical care

Turner contends that there is no evidence that he prevented the provision of medical care to Bennett.  Turner Motion at 19.  The timing issues immediately after the shooting are in dispute, but for the reasons set forth in my discussion of this claim with respect to the county defendants, Turner is entitled to summary judgment on this claim as well.

---

to constitute part of a relevant pattern or practice or to provide notice to Herrick or the county for purposes of supervisory liability.

### c.  Quartering

Turner argues that the Third Amendment "has no applicability to this matter involving police, not soldiers[.]"  *Id*. at 11 n.8.  For the reasons previously discussed, I agree.  Turner is entitled to summary judgment on any such claim.

### d.  Qualified immunity

Like the county defendants, Turner cites *Buchanan v. Maine*, 417 F.Supp.2d 45 (D. Me. 2006), in support of his position that qualified immunity bars the plaintiffs' Fourth Amendment claims against him.  *Id*. at 16.  Turner is entitled to qualified immunity on all of the Fourth Amendment claims for the reasons discussed at length above.  The plaintiffs offer no factual distinctions with respect to Turner that require a different outcome.  With respect to the shooting, there is no evidence that Turner shot Bennett or fired his weapon at all.[34]  He is entitled to summary judgment on all Fourth Amendment claims on the basis of qualified immunity.  This makes it unnecessary to consider the substance of any of the Fourth Amendment claims asserted against Turner.

*2.  Additional issues*.  Turner also asserts that he is entitled to summary judgment on any claims that he failed to prevent others from shooting Bennett, that he engaged in a conspiracy to prevent the plaintiffs from exercising their constitutional rights and for punitive damages.

### a.  Failure to prevent shooting

Turner acknowledges that there are limited circumstances in which an individual may be liable for the use of excessive force by others, but he argues that the evidence does not fit within those circumstances in this case.  *Id*. at 13-15.

The governing law is as follows:

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates

---

[34] The only factual assertion to the contrary by the plaintiffs has been stricken from the summary judgment record.  *See* n. 24 above.

> in another's affirmative acts, or omits to perform an affirmative act which he
> is legally required to do, that causes the deprivation of which complaint is
> made. Moreover, personal participation is not the only predicate for section
> 1983 liability. Anyone who "causes" any citizen to be subjected to a
> constitutional deprivation is also liable. The requisite causal connection can
> be established not only by some kind of direct personal participation in the
> deprivation, but also by setting in motion a series of acts by others which the
> actor knows or reasonably should know would cause others to inflict the
> constitutional injury.

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560-61 (1st Cir. 1989) (citations omitted).

The plaintiffs do not respond to Turner's argument on this issue and seldom mention him separately in their presentation on liability for the shooting under section 1983. They note only, Plaintiffs' Opposition at 23, that Turner "took out his service revolver sometime after Wainwright returned [inside the house] but before Baker arrived," Plaintiffs' SMF ¶ 378; that there was "a relationship between the state and the person injured (here Officer Turner and Arlene Bedard and Daniel Bennet[t]) during which the state placed the victim in danger of foreseeable injury of being pushed to injury by Wainwright," Plaintiffs' Opposition at 28; and that "Turner [and others] exerted sufficient control over Dan to meet the relationship requirement in that they had taken over the house to bring him into protective custody," *id*. at 29. The latter two assertions are not supported by citations to paragraphs of the plaintiffs' statement of material facts that even mention Turner. This is simply not enough to withstand a motion for summary judgment under the *Cartagena* standard. The plaintiffs offer no evidence that Turner was "the man in charge" inside the house, as was the officer at issue in *Cartagena*. 882 F.2d at 561. It might be a close question in this case had the plaintiffs been more specific about what they allege Turner did that "caused" Wainwright and Baker to shoot Bennett, but the plaintiffs have not done so. Turner is entitled to summary judgment on any claims arising out of this indirect theory of liability. *See generally Kaluzynski v. Armstrong*, 2001 WL 521851 (D. Me. May 16, 2001), at *11 (rec. dec. aff'd 2001 WL 812240 (D. Me. July 17, 2001)) (officers who did not

49

participate in formulating plan of action that called for use of excessive force not liable under § 1983 for shooting of plaintiff's mentally ill decedent).

### b. Conspiracy

The complaint alleges that the defendants conspired "to prevent plaintiffs from exercising their civil rights" by harassing and "terroriz[ing]" them "by calling from the Oxford County Sheriff's Office repeatedly and without cause to plaintiff's [sic] home at early morning times and then not engaging in conversation but repeatedly and continuously remaining silent to intimidate." Complaint ¶ 46c[2]. As Turner suggests, Turner Motion at 11, the plaintiffs do not offer any evidence that Turner was involved in this alleged conspiracy. I note that he is a state trooper, not an employee of the Oxford County Sheriff's Office, and thus the plaintiffs are not entitled to any inference that he was involved in the alleged activity. He is entitled to summary judgment on this claim.

### c. Punitive damages

There is no need to consider the plaintiffs' claim for punitive damages against Turner because I have recommended that dismissal of or summary judgment as to all substantive claims asserted against him.

### IV. Conclusion

For the foregoing reasons: (i) the plaintiffs' motion to exclude the testimony of David Dusenbury is **DENIED**; (ii) I recommend that defendant Timothy Turner's motion to dismiss and for summary judgment be **GRANTED;** (iii) I recommend that the motion of the remaining defendants for judgment on the pleadings be **DENIED** as to any claims for violation of the equal protection rights of Daniel Bennett and as to Count II of the complaint and otherwise **GRANTED**; and (iv) I recommend that the motion of the remaining defendants for summary judgment be **GRANTED** as to all remaining claims asserted against them.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of May, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge